UNITED DISCTRICT AND BANKRUPTCY COURTS
FOR THE DISTRICT OF COLUMBIA

Carlos M. Harley
6503 Hilmar Drive, #303
District Heights, MD 20747
301.605.3015
carlosharley24@yahoo.com

VS,

Covington and Burling, LLC
850 10th Street, NW
Washington, DC 20001-4956
202.662.5526
jhuvelle@cov.com

Case: 1:18–cv–02633
Assigned To : Unassigned
Assign. Date : 11/15/2018
Description: Pro Se General (F–DECK)

Complaint

I am requesting a trial by jury for my wrongful termination and physical assault placed upon me by a Covington and Burling employee for my Title VII protected activity which was established in the respondent's position statement, when the supervisor knew of the protected activity. Covington and Burling did not protect my Title VII rights as an employee thereafter took an adverse action against me the complainant after it was reported to HR about physical assault harassment, racially incentive remarks, and.

Therefore, I am requesting restitution from Covington and Burling, LLC in the amount of three and half million do llars ($3,500,00.00) for all pain and suffering related to my injuries, and wrongful termination with the firm.

I was hired as a Covington and Burling Security Officer from May 2017 to March 2018, at the Covington and Burling headquarters in Washington DC.  On the morning of March 16, 2018, on the job site in the company parking garage, I was physically assaulted by Security Supervisor Derek New, in retaliation of my complaint to HR of harassment, bias, and physical intimidation.  From this attack, I incurred injuries to my neck, ankle and body bruises.

Prior to this physical attack, I made complaints to HR manager Nisa Walls on December 14, 2017, concerning myself being harassed and intimidated with threats of termination by Supervisor Derek New.

- There were threats of possible termination and accusations to me on more than one occasion of me not doing my job which was unfounded.  For example I was threaten in front of an employee, Officer Cox, concerning a complaint made by an attorney that his door was not secured based on an email on October 24, 2017, from Manager Michael Lamb stating: I need to pay closer attention to which offices should or should not be secured. I explained to Supervisor New that I did secure the door, and he said that you did not secure the door, and if you can't do what is asked of you, you will be fired". When he made that threat, I asked him why are you threatening me for my job. Later I received an email on that same date (October 24, 2017) from Manager Michael Lamb apologizing for this specific complaint of the office not being locked, because he later found it was someone else who unlocked the door. (refer to attached e-mail)

- There where several racial remarks said to me, one in particular by a former employee named Joe Weldy who is white, asked me did I have any crack.  And I questioned him as to why he would ask me such a ridiculous thing.  Another time Joe made a racial remark to me stating that a particular contract worker, who is black, was my brother, inferring that all black males are my brothers.

- On a separate occasion Supervisor New made the same racial remark to me about this black man who was walking in the office at that time, again inferring that all black males are my brothers.

- Included in my initial complaint to HR was professional bias in that on any particular shift there are two security officers on night shift.  However, I would be singled out for non-completion of a task that was the duty of both officers which I have video photos of me completing these tasks.

- On December 13, 2017, after shift I was called into Supervisor New's work area.  At this time he states that papers where not removed from the printers (by the way there are over 500 printers in the building).  He made this remark to me based on a statement from the other officer (Chauncy McBride).  When I replied I did remove the papers during my patrol Supervisor New became irate and stood close to me in an intimidating fashion and his voce could be heard throughout the office stating "defensive when you are told of an infraction; he then said you are going to get written up and I'm through you Harley and I am tired of your shit."  I felt threaten as he said these things to me and  felt that he was trying to bait me to get mad and lose my temper so that I could be written up for "gross insubordination" and could easily terminated.  I then walked out and the building and contacted Ms. Nisa Walls the head of HR the next day.

In January 2018, I spoke with the head of HR Nisa Walls, concerning my complaint. She said she met with Supervisor New on December 22, 2017, following the bullet and harassment complaint made by me. During the course of their conversation she made New aware he could not retaliate against me in light of my bringing forth my complaint to HR.

- On March 6, 2018, I had a meeting with Manager Michael Lamb telling me that I was going around the building spreading the rumor that Supervisor New is a racist.  To astonishment, I asked him who told him that, he stated that there were several employees that told him that but he would not give me the employees' names.

- On March 16, 2018, I was on my last patrol of the morning; walking through P3 Garage when Supervisor New drove down the control ramp to park.  He stopped his vehicle rolled his window down and said "Harley I need to talk to you."  Then I said what's going on?  And he said "Why are you going around telling people I'm a racist."  I explained to him I did not call him a racist.  He said to me "You are and MF liar and you ain't S*** and your time at the firm is short."  After making these statements he parked his car and went on to check the final door on my patrol and walked toward the elevator that we both have to get on.  He got out of his vehicle cussing and continually saying I was a liar and my time with the company was short. And I don't care if you go back and tell Ms Nisa Walls."  He also said check with your boy Officer Cheatam because He told me you called me a racist."  As I'm standing there he approached and said "If we were outside I would whip you're A**."  I responded that "you are not going to do anything to me."  That's when he threw a punch at me and wrapped his arms around my neck trying to wrestle me to the ground.  I get him off of me and refer to him to cameras and said "I'm going to call the police."  I immediately walked upstairs and called MPD and Supervisor New went upstairs like nothing had happened based on eye witness who saw Officer New who came into the office and started working.

Relief

I am seeking relief for pain and suffering of wrongful termination; physical injuries; damage to my reputation; as well the financial burdens placed upon me and family due to my unexpected unemployment.

*Carlos M. Harley*

*15 Nov 2018*

# RE: Carlos M. Harley v. Covington & Burling
# EEOC Charge No. 570-2018-01930

**A. Respondent is Liable for Retaliation Following Complainant's Engagement in Protected Activity**

Title VII provides that for a plaintiff to establish a *prima facie case* of retaliation, he must show that (1) the plaintiff engaged in protected activity; (2) the defendant knew of the protected activity; (3) thereafter, the defendant took an adverse action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *E.g. Henderson v. Rice*, 407 F. Supp. 2d 47, 53 (D.D.C. 2005); *Wasek v. Arrow Energy Services, Inc.*, 682 F.3d 463, 468-69 (6th Cir. 2012) (defining *prima facie* elements of a Title VII retaliation claim). Mr. Harley has met this burden at the *prima facie* stage to establish all four elements of a retaliation claim. *Henderson*, 407 F.Supp. 2d at 53.

First, it is not in dispute that Mr. Harley engaged in protected activity under Title VII by complaining to Respondent's human resources office about "racially insensitive remarks" made by his manager, Mr. New, in December of 2017. *See* Respondent's Position Statement, attached hereto as Exhibit B, at 2.

Likewise, it is also not in dispute that Respondent knew of Mr. Harley complaint and engagement in protected activity. *See id.* Respondent states in its position statement that Nisa Walls, Respondent's Human Resources Director, received a complaint of discrimination about Mr. New, Complainant's manager, directly from Complainant on December 14, 2017. *See* Respondent's Position Statement at 3; Notes of Ms. Walls (stating "Mr. Harley says that [Mr. New] also makes racial jokes" such as saying that African American males are Complainant's "brother" and asking whether Complainant smokes crack). Ms. Walls is the individual at Respondent's Human Resources, who was involved not only in resolving employee discrimination complaints, but also in personnel actions generally, such as termination. Moreover, Annette Wigton, who recommended Complainant's termination, including to Ms. Walls, acknowledges that Mr. Harley made a complaint about "racially insensitive comments[.]" Respondent's Position Statement at Ex. D at 2–3. Therefore, there can be no dispute that Respondent's knowledge has been established. *See e.g. Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002) (stating that a plaintiff need only present evidence sufficient to establish that the individuals charged with taking the adverse employment action knew of the protected activity).

Third, termination and suspension plainly qualify as adverse employment actions under Title VII. *See, e.g., Wasek*, 682 F.3d at 470. **Importantly, being physically attacked by a supervisor is an adverse action if done so in furtherance of an illegal act under Title VII, such as happened here where Complainant was retaliated against via physical force by his manager, Mr. New, because of his protected activity.** *Oncale v. Sundowner Offshore Services*, 523 U.S. 75, 80 (1998) (Title VII prohibits physical harassment in the workplace because of discrimination). Certainly, a manager physically assaulting someone for making a discrimination complaint against them to human resources, as happened here, is intended to dissuade them from filing such complaints and would constitute, *by definition*, an adverse action. *See Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 60 (2006) (An action is adverse if it likely would have "dissuaded a reasonable worker from making or supporting a charge of discrimination") (internal quotations omitted). The EEOC's own guidance supports this conclusion. *See EEOC Enforcement Guidance on Retaliation and Related Issues,* ("physical behavior that is reasonably likely to deter protected activity, even if it is not sufficiently 'severe or pervasive' to

# RE: Carlos M. Harley v. Covington & Burling
## EEOC Charge No. 570-2018-01930

create a hostile work environment" is an "adverse action" within the context of retaliation), available at https://www.eeoc.gov/laws/guidance/retaliation-guidance.cfm.

Lastly, as set forth below, Complainant also established that he engaged in protected activity and that a causal link existed between his complaint, assault by Mr. New, and termination. Mr. Harley's complaint about "racially insensitive comments" is mentioned in the termination recommendation for him. Respondent's Position Statement at Ex. D at 2-3. Moreover, as admitted by Respondent, the physical altercation with Mr. Harley engaged in by Mr. New occurred specifically because of Mr. Harley's complaint about Mr. New's racial comments. *See id.* at Ex. E, recommended termination of Mr. New at 4 (noting that Mr. New, "a manager" made "statements toward Harley (to which he admitted) [that] were threatening and made in retaliation for Harley having made a complaint about New's treatment of him and statements toward him" and then a physical altercation occurred); *see also* Ex. C (in response to allegations that Complainant made about racially insensitive comments to human resources that "[Mr. New] was somewhat upset saying that he is tired of the 'race card' being played with him"). Moreover, the temporal proximity between the adverse actions and Mr. Harley's complaint is sufficient, on its own, to establish causation. *E.g. Castle v. Bentsen*, 867 F. Supp. 1, 3 (D.D.C. 1994) (holding that three to five months is a short enough time lapse between EEO activity and reprisal to establish a causal connection); *Robinson v. Ergo Sols., LLC*, 257 F. Supp. 3d 47, 54 (D.D.C. 2017) ("Six months, then, seems to fall into a gray area"); *see also* Rebuttal at 3 (adverse actions, including suspension, occurred "[t]hree months later").

**B.    Respondent is Liable to Complainant for Retaliation Resulting from Mr. New's Retaliatory Physical Assault Following Complainant's Engagement in Protected Activity**

There can be no dispute that Mr. New's physical assault and verbal abuse of Mr. Harley on the day in question, as admitted by Respondent, resulted because Mr. Harley made a complaint of discrimination to Human Resources regarding Mr. New. *See* Respondent's Position Statement at Ex. E, recommended termination of Mr. New at 4 (noting that Mr. New, "a manager" made "statements toward Harley (to which he admitted) [that] were threatening and made in retaliation for Harley having made a complaint about New's treatment of him and statements toward him" and that Mr. New then engaged in a physical altercation with Complainant); *Id.* at Ex. C (in response to human resources bringing the allegations that Complainant made about racially insensitive comments by Mr. New to human resources that "[Mr. New] was somewhat upset saying that he is tired of the 'race card' being played with him"); Mr. New's engagement in a physical altercation with Mr. Harley because of his complaint constitutes unlawful retaliation in violation of Title VII. *EEOC Enforcement Guidance on Retaliation and Related Issues*, ("physical behavior that is reasonably likely to deter protected activity, even if it is not sufficiently 'severe or pervasive' to create a hostile work environment" is an "adverse action" in the context of a retaliation claim), available at https://www.eeoc.gov/laws/guidance/retaliation-guidance.cfm.

Mr. New's physical assault and verbal abuse towards Complainant because of his protected activity (again as admitted by Respondent) is directly imputable to Respondent as Mr. New is a "manager." *See* Rebutal at Ex. E, recommended termination of Mr. New at 4 (noting Mr. New is a manager). As the EEOC guidance explains, "the [Supreme] Court held that an employer is always liable for a supervisor's harassment if it culminates in a tangible employment action." Since Mr. New's physical assault of Mr.

# RE: Carlos M. Harley v. Covington & Burling
# EEOC Charge No. 570-2018-01930

Harley occurred because of his complaint of discrimination, such assault constitutes a tangible adverse action for which liability is imputed to Respondent. *See Enforcement Guidance on Vicarious Employer Liability for Unlawful Harassment by Supervisors*. Furthermore, no affirmative defense is available to Respondent in such cases. The Supreme Court recognized that this result is appropriate because an employer acts through its supervisors, and *a supervisor's undertaking of a tangible employment action constitutes an act of the employer*. *Id.* at *Harassment by Supervisor That Results in a Tangible Employment Action* (emphasis added).

The EEOC has previously taken the position that "evidence presented in support of a plaintiff's *prima facie* case may alone be sufficient to create a triable issue of pretext[.]" *Amicus Curiae in Support of Plaintiff-Appellant, McKinley v. Skyline Chili*, Inc., No. 12-4064 (6th Cir. 2012) (citing *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 530, 533 (6th Cir. 2007)), available at https://www.eeoc.gov/eeoc/litigation/briefs/mckinley.html. Complainant has presented such evidence here to create a triable issue of retaliation, if not judgment as a matter of law in Mr. Harley's favor due to Respondent's admissions.

As the EEOC has recognized, there can be no excuse for an employer's manager to physically assault an employee because of that employee's engagement in protected activity to report suspected discrimination. Common sense even dictates that physical assault in response to a complaint of discrimination violate Title VII's anti-retaliation provisions. Therefore, the EEOC should reopen this matter, view the video footage referenced by Respondent in its position statement, and determine whether the Mr. New's the physical and verbal assaults by Mr. New because of the protected activity constituted unlawful retaliation.

Importantly, Respondent cannot claim that it did not have advanced notice that Complainant's manager, Mr. New, had retaliatory animus which then led to the verbal assault and physical altercation in March 2017. Previously, on December 22, 2017, Human Resources was put on notice that Mr. New was "upset" and felt that the "'race card' was being played with him" because of Complainant's complaint to Human Resources. Rebutal at Ex. C. For these reasons, the EEOC should reverse its determination and find cause on this adverse action.

## C.   Respondent's Claimed Basis for Complainant's Termination Does Not Absolve it From Liability for Unlawful Retaliation

Upon Mr. Harley's presentation of satisfactory evidence to establish a *prima facie* case of retaliation, the burden then shifts to Respondent to provide a legitimate, nondiscriminatory reason for the termination of Mr. Harley's employment. *E.g. Patterson v. Johnson*, 505 F.3d 1296, 1299 (D.C. Cir. 2007). However, Respondent has not presented a legitimate, nondiscriminatory reason for Mr. Harley's termination to the EEOC as Respondent justifies its decision to terminate Mr. Harley's employment on the basis of retaliation, which is impermissible.

While Respondent mentions issuing two prior performance-related disciplinary actions against Mr. Harley in its position statement, the latest of which was four months prior, Respondent was not driven to suspend and terminate Mr. Harley based upon any performance related deficiency. *See* Respondent's

# RE: Carlos M. Harley v. Covington & Burling
# EEOC Charge No. 570-2018-01930

Position Statement.  To the contrary, Respondent was motivated to suspend Mr. Harley and terminate his employment because of the physical altercation with Mr. New.  *Id.*  As Respondent's "recommendation for termination" of Complainant explains, "[s]ince January . . . no discipline has been issued to Harley."  *Id.* at 2.

Thus, Mr. Harley's suspension and termination would not have occurred "but for" the physical altercation initiated by Mr. New on March 16, 2018.  *See id.* at 2-3.  In this respect, Respondent explains that, because there apparently were no witnesses outside of the two men, it relied upon a videotape of the incident.  *See id.* at Ex. D at 3.  Based upon this videotape, Respondent alleges that it determined that "both [men] engaged physical contact" and were "engaged in a heated exchange."  *Id.*  Therefore, Respondent claims it terminated Complainant.  It is noted, however, that Complainant "claimed he defended himself only."  *Id.*  Complainant maintains this position.

Respondent did not produce the videotape for review to the EEOC.  Complainant requests that the EEOC, *at a minimum*, obtain a copy of the videotape for review so that it can be determined whether Respondent's explanation that Complainant also committed misconduct is "worthy of credence" or is pretextual.  *See George v. Leavitt*, 407 F.3d 405, 414 (2005) ("'Pretext may usually be established by demonstrating that the employer's proffered reason is simply false'") (quoting Lex K. Larson, *Employment Discrimination*, § 8.04, at 8-62 (2d ed. 2005)).  Importantly, when a videotape is available but not presented, numerous court hold that such failure to produce a videotape results in adverse inference against the party relying upon and in possession of the videotape. E.g. *Zhi Chen v. District of Columbia*, 839 F. Supp. 2d 7 (D.D.C. 2011).  Therefore, should the videotape not be produced to the EEOC, Respondent should have an adverse inference against it that its version of events is not true, that its proffered reasons are pretextual, and a finding of cause should be made for Complainant.

For these reasons, Complainant respectfully requests that the EEOC reopen this matter, rescind its determination, review the video footage of the altercation with Mr. New, and make a finding of cause for Complainant.

**Harley, Carlos**

| | |
|---|---|
| **From:** | New, Derek |
| **Sent:** | Saturday, January 13, 2018 11:09 AM |
| **To:** | Harley, Carlos |
| **Cc:** | Lamb, Michael |
| **Subject:** | Papers found on printers. |
| | |
| **Importance:** | High |

*my copy*

Carlos,

I am asking you to **please stay focus and pay attention when you are clearing off printers.** Last night on your shift you informed officer Navarro that you cleared off all the printers and he did not have to worry about doing it. I have also heard this statement from several other Officers that when you come in on your shift you start clearing off the printers and inform them that they do not have to worry about doing it. When the other officers going on patrol they come across papers on printers.

**Last night on your shift 01/13/2018 Officer Navarro found papers on 7N and 4 N near the IDF closet. This papers were printed off 7N at 5:45 PM and**
**4N 6:03 PM. 01/12/2018**
**Carlos I am asking you that when you come in for your shift. Please get the pass downs for the officers going off shift. Review the building Memos from Hines and what is going on in the buildings that night during your shift and check your emails.**

We know that you are busy at the being of your shift with escort the cleaners and at times Contractors. You do not have to rush doing the printers right away. My suggestion is have your lunch after your escorting and roughly around 01:00 hrs you can patrol the buildings checking all printers. You have to the end of your shift to do this and you can split the work with the other Officer your working with. I am just suggestion this to you.
**Remember that the printers should only be cleared off after midnight and not before.** Security's job it to take all findings and checked the date and time the documents were printer off and disregard them by putting them in the sherd bins on the floors you found them on.
You might even want to add this to the daily log where you found the papers on the printers. Just a suggestion.

Please reply to this email. Should you have any question about this please feel free to talk with Mike or myself.
Thank you,
-Derek

Derek New
Manager of Security & Safety

Covington & Burling LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001-4956
T +1 202 662 6257 | dnew@cov.com
www.cov.com

This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail from your system. Thank you for your cooperation







**COVINGTON & BURLING LLP**

Privileged & Confidential                                                                March 22, 2018

**Memorandum**

To:     Lindsay Burke; Jeffrey Huvelle; John Waters

From:  Annette Wigton

cc:      Matthew Mitchell; Nisa Walls

Re:      **Recommendation for Termination – New, Derek**

On Friday, March 16, 2018, I was made aware of a physical altercation between Derek New, Security Manager and Carlos Harley, security officer having taken place on the P3 level of the City Center parking garage at approximately 5:30 a.m.  Derek New is Carlos Harley's direct supervisor.

By way of background, New has been charged with the management of the security team since April, 2017 and has been a security officer since 2012.  Since becoming a manager, New has been overheard using inappropriate language when addressing coworkers, subordinates and other members of staff.  He has been counseled, however, New has been unable to sustain improvement in this area of his performance.

New recommended Harley for hiring in May 2017.   New counseled Harley on August 25, 2017 and November 20, 2017 for performance issues.  On December 14, Harley reported to Human Resources that he was being harassed and bullied by New and that New had made inappropriate comments based on his race (New is Caucasian, Harley is African American).

**COVINGTON & BURLING** LLP

March 22, 2018
Page 2

On December 22, Nisa Walls met with New following the bullying and harassment complaint made to her by Harley. During the course of this conversation, Nisa made New aware that he should not retaliate against Harley in light of him bringing forward his complaint to HR. Walls advised New that he should continue to manage his performance as he would any other of the security guards, and explained that Harley was on final warning for his performance issues. New was counseled to be sensitive to his conduct and his words in the workplace.

After the altercation occurred on March 16, I met with New later in the morning and asked him to explain what had happened. New told me that he was driving into the parking lot and upon seeing Harley, he rolled down his car window to talk to him. New stated that he greeted Harley with a good morning and then asked him to refrain from telling his supervisors, security guards and Nisa Walls that he is a racist. New went on to explain that he had hoped by asking that Harley would stop saying these things about him. New said he parked his car and got out and Harley immediately chest bumped him. To defend himself, New said that he put his arm around Harley's head to restrain him from making further advances towards him. When New let go, Harley moved away and New made his way to the elevator and into the office building. New said that during the altercation, Harley had pointed to the ceiling indicating the incident had been captured on camera.

I asked New why he thought it appropriate, as his supervisor, to ask Harley to stop telling others he is a racist. New said he was sick of Harley and that he should no longer be working for the firm. He has been warned about his behavior and performance and yet HR had concluded he could not be fired. New went on to say that even though he recommended Harley for employment at Covington and was warned by Admiral (Hines property managers' security

**COVINGTON & BURLING LLP**
March 22, 2018
Page 3

company) about his argumentative style, he now regrets it.  I asked New why he engaged in a physical altercation with Harley and he said he was defending himself from Harley's advances.

Following the meeting with New, I viewed the video tape capturing the incident.  While it is not evident who instigated the altercation, it is clear that New and Harley both engaged in physical contact.  New is seen putting his arm around Harley's head apparently in an effort to subdue and pull him to the ground.  Subsequently, the two men stood chest to chest, exchanging words. Neither appears injured or fearful of the other or as if he is in retreat. New is then seen withdrawing from Harley but continuing to gesticulate and argue before retreating to the elevator vestibule.  New walked away from the vestibule and toward Harley two more times before finally getting on the elevator; the two were obviously engaging in a heated exchange. Throughout the altercation, New is holding a soft-sided briefcase in his left hand.

I met with Harley in the afternoon of Friday, March 16 and he offered a version of the event that differed somewhat from Derek New's.  He recited that New rolled down his window and asked him not to call New a racist, which Harley denied.  Harley reported that New went on to say that Harley's days were numbered and that he was "tired of his shit." Harley explained that after New got out of his car, Harley told him that he never called him a racist, to which New responded, "If we were outside, I'd whoop your ass." Harley described how New came towards him, grabbed him and put him in a headlock, throwing a punch at him, twisting his body and trying to pull him to the ground.

Despite differences in their accounts, both employees admitted participating in a verbal exchange followed by a physical altercation, followed by additional heated exchange.  That evening, both employees were notified and placed on paid suspension pending further investigation.

**COVINGTON & BURLING** LLP

March 22, 2018
Page 4

I recommend immediate termination of Derek New based on this conduct, which violates the firm's expectations for employees and managers. His statements toward Harley (to which he admitted) were threatening and made in retaliation for Harley having made a complaint about New's treatment of him and statements toward him. He was not only cautioned not to engage in any retaliatory conduct toward Harley by Nisa Walls, but as a manager, it is absolutely unacceptable to provoke, threaten, or engage in physical conduct with a subordinate under any circumstances.

# COVINGTON



Policies and Procedures → Anti-Harassment Policy

## Anti-Harassment Policy



### Introduction:

Our culture of teamwork and collaboration is a bedrock value of the firm.  Working together seamlessly within teams and across practices and offices is one of the firm's fundamental strengths.  It is what we want for ourselves as a community of professionals, and it ensures that we provide our clients with the very finest legal representation.

To nurture this culture, we must remain sharply focused on promoting and enhancing an environment of inclusion, where all lawyers, professionals and staff feel welcome and valued.  This includes the critical importance of remaining constantly vigilant to ensure that no one at the firm experiences conduct that could be viewed as harassing or unwelcome.

We write to reiterate and reemphasize the importance of the firm's policies in this area, which are found on the firm's intranet and in the firm's compilation of "Key Policies."  We believe the firm has an exemplary track record of promoting an inclusive environment, but we must give these issues constant attention.  The firm has regularly reviewed and updated these policies over time, and we will expect all lawyers, professionals and staff to review these policies annually.

It is particularly important that people come forward if they experience or observe conduct that could be viewed as harassing or unwelcome.  This includes both conduct within the firm and interactions with clients, opposing counsel or others outside the firm.  This reporting process is an essential element of ensuring that we are fostering the collaborative, inclusive culture that is so important to the firm's values and success.

Lawyers may report any such conduct to any of the firm's ombudspersons or to Human Resources.  All other professionals or staff  should report such conduct to any member of the Human Resources staff.  Anyone may also report such conduct to any member of the Management Committee.  Any reports will be investigated, and will be held in confidence to the extent practical and appropriate.  Any individual who is found to have violated the Firm's policy regarding harassment will be subject to appropriate disciplinary action, up to and including termination.

We greatly appreciate everyone's attention to this important subject.

The Management Committee

### Anti-Harassment Policy

The Firm's policy is to provide and support a working environment free of all forms of harassment including sexual, racial and any other unlawful harassment. Whether at the Firm or in other work-related settings, such as business trips or business related social events, any type of harassment – whether perpetrated by a person within the firm or by clients, opposing counsel or others outside the firm – is unacceptable and will not be tolerated.

Harassment consists of unwanted and/or offensive conduct, whether verbal, written or physical, that creates a hostile, degrading or offensive work environment, and that is based upon or related to a person's race, color, ethnicity or ancestry, religion or religious belief, national origin, age, sex, gender, gender

### View Policies For:

Policies Compilation

Attorneys & Other Professionals

Billing Policies

Business Systems

Expense Policies

FINRA and SEC Post-Announcement Inquiries

Firm Committees

Firm Management

Firmwide Staff Policies

Key Policies

Non-Billable Classifications

Office Policies & Practices

Office Services

Professionals & Staff

Records Retention (US Offices)

identity or expression, marital status, sexual orientation, genetic information, family responsibility, physical or mental disability, legally protected medical condition, military status, veteran status, or any other improper criterion as determined under the law applicable to the relevant office.

Other kinds of harassment include any conduct, whether verbal or physical, that has the effect of being threatening, intimidating or coercive. It also includes any conduct that creates a hostile, degrading or offensive work environment and/or impairs the victim's ability to perform his or her job.

Sexual harassment is defined as unwelcome sexual advances, requests for sexual favors, or any verbal, physical or graphic conduct of a sexual nature in a situation in which:

> i. submission to such conduct is made either explicitly or implicitly a term or condition of an individual's continued employment; or

> ii. submission to or rejection of such conduct by an individual is used as a basis for employment decisions affecting the individual; or

> iii. such conduct has either the purpose or the effect of interfering with an individual's work performance; or

> iv. such conduct has either the purpose or the effect of creating an intimidating, hostile, or offensive working environment.

Particular caution and judgment must be exercised in any consensual romantic and/or sexual relationships between Firm personnel at different levels of responsibility, because it is sometimes difficult to distinguish between consensual and unwelcome situations. Those who hold positions of seniority or authority should recognize that their stature within the firm may cause others more junior to feel constrained in responding to their words and actions in social or personal interactions. Lawyers, professionals or staff should not have supervisory authority over a person with whom they are romantically involved.  Furthermore, because of the inherently supervisory nature of all lawyers in relation to all summer associates, firm lawyers are not permitted to pursue or engage in romantic relationships with summer associates during their summer with the firm.

Lawyers should report any harassment to any of the firm's ombudspersons or to the Human Resources manager for the lawyer's office. All other professionals or staff should direct such reports to any member of the Human Resources staff. Anyone should also feel free to report concerns regarding harassment to any member of the Management Committee. All complaints will be promptly, appropriately, and objectively investigated. Confidentiality will be maintained to the extent practical and appropriate under the circumstances, and the complainant will generally be notified once the investigation is completed.  Any individual who is found to have violated the Firm's policy regarding harassment will be subject to appropriate remedial action, including, for employees, disciplinary action up to and including termination.

All supervisory and management personnel and all partners are expected to take immediate and appropriate action to prevent or stop any sexual or any other type of harassment in the workplace of which they become aware, whether by Firm personnel or by individuals outside the Firm, including clients, and must report such conduct to a member of the Management Committee, a member of the General Counsel committee, or the Chief Human Resources Officer.

The Firm will not retaliate, nor will it tolerate any attempt at retaliation, against a person who raises concerns in good faith. Concerns about attempted retaliation should be raised (and will be handled) in the same manner as concerns about improper harassment.

Subject: **FW: Clearing Off Printers.**

From: CHarley@cov.com

To: carlosharley24@yahoo.com

Date: Wednesday, January 10, 2018 01:52:25 AM EST

**From: New, Derek**
**Sent: Tuesday, January 09, 2018 7:34 AM**
**To: Harley, Carlos <CHarley@cov.com>**
**Cc: Lamb, Michael <MLamb@cov.com>**
**Subject: RE: Clearing Off Printers.**

Carlos,

When you came on shift last night you asked Officer Cheatham and Mc Bride what is going on. They replied to you that you should check your emails as Derek sent out a few emails over the weekend to the Security team.

One of the emails was regarding clearing off the printers and the time you do it. On Jan 8, 2018 you started to clear off the printers at 21:35 hrs.

You also replied to my emails on Jan 9, 2018 at 01:38 hours regarding clearing off the printers.

Carols when you first started with Covington Officer Weldy and myself both informed you on how to clear off the printers and what time you should be doing it. On January 4-5 2018 you worked with Officer McBride. Officer McBride informed you about what time you should be clearing off the printers and you replied back to him with it's the first time I am hearing this. Officer McBride also found documents on printers that night after you checked them in two different locations.

You were also informed by Officer Weldy and myself during your training that the 2South printers Accounting area we do not remove any papers on the printers.

Please reply to this email.

Thank you,

-Derek

*POST ORDERS*

Subject:   **FW: Shift Duties**

From:   CHarley@cov.com

To:   carlosharley24@yahoo.com

Date:   Tuesday, September 12, 2017 03:04:49 AM EDT

This message contains blocked images.   Show images   or   Always show images

**From:** Harley, Carlos
**Sent:** Wednesday, July 26, 2017 9:58 PM
**To:** New, Derek
**Subject:** RE: Shift Duties

Thank You Sir!

**From:** New, Derek
**Sent:** Wednesday, July 26, 2017 12:16 PM
**To:** Green, Kimberlee; Navarro, Mario; Harley, Carlos; Cheatham, Donald; McBride, Chaunce;
Weldy, Joseph; Cox, James; Brooks, John
**Cc:** Lamb, Michael
**Subject:** Shift Duties

All,

This only a friendly reminder of what is expected from you:

I would like to thank all of you for the extra hours you all worked and
patience with the construction that is happening throughout the
buildings.

Communication is the key for all of us to conduct our work in a good
manner.

**When arriving for your shift:**

o There should be a joint security inventory conducted by you and the incoming officer.

o The officer working the desk, should be reviewing C-Cure and clearing any alarms.

o The officer should be responding to any incoming emails or reviewing security related information.

o You should be reviewing the Hines Building Memo & Covington Memos of what activity is taking place.

o All HVAC request should be going through the **OFFICEPMO** and cc **Security WA.**

o Please note that Facilities Dept. **don't follow up on HVAC request** on the weekends.

o In the Daily Logs, All shift activity should be annotated with correct information

o The G St. Main Door camera should be up at all times

o During your shift, please make sure you are monitoring the activity where the construction is happening.

o The camera should be up when there are Covington events in places like the Patio or Ruff Room.

## Patrol Duties:

o During your patrol, you should be checking for any issues like water leaks, janitor closets for floods, debris, and etc.

o The sky bridge doors should be locked every night and unlocked the next morning by 6am including weekends.

o Please make sure you check all doors and that they are closed behind you and/or any door you follow up with are card readers.

o If you are working alone or leaving the desk, you should always place the Security Sign (away) and have the blackberry with you at all times.

o The officer carrying the blackberry should be acknowledging the emails at all times. The settings should be placed in normal; Not in **"Vibrate or Silent mode"**

o If you are leaving the desk, you must lock your computer screen at all times.

o Please note, you should not be congregating at the North or South Lobby for long periods of time. **Especially the Tech Bar!**

o  No Cov Staff are allowed to playback footage at the Tech Bar without the permission of **Mike or Myself.**

o  Please keep all security related information within the unit and refrain from exposing confidential information to Cov staff or outside people.

o  As we know with all the construction, we are tasked with locking offices and unlocking offices as part of our shift duties for the next months ahead.

o  During the weekend shift, please make sure you check and scan the incoming mail as soon as it arrives.

o  Please note accurate information on the Loaner Card and Weekend Parking Pass sheets. **(Who signed in or signed out)**

o  **Please note,** certain contractor badges should be provided to the proper construction companies as some of these badges have specific clearances on them.

o  If mail or packages arrive at the Lobby Reception, the Admiral Security should be contacting us.  We should be going to the lobby to retrieve it and annotating it in the daily log. Please deliver it to the mail room. After, you should be sending an email to **Office Services**.

Please reply to this email that you acknowledge it or if you have any questions, don't hesitate to ask Mike or myself.

Thank you,

-Derek

**Derek New**
Manager of Security & Safety

Covington & Burling LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001-4956
T +1 202 662 6257 | dnew@cov.com
www.cov.com

This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail from your system. Thank you for your cooperation.

**Harley, Carlos**

| | |
|---|---|
| **From:** | New, Derek |
| **Sent:** | Wednesday, October 18, 2017 1:52 PM |
| **To:** | Green, Kimberlee; Navarro, Mario; Weldy, Joseph; Harley, Carlos; McBride, Chaunce; Cheatham, Donald; Cox, James |
| **Cc:** | Lamb, Michael |
| **Subject:** | Weekly Patrol. Shift Duties. |

All,

During your shift please make sure you are checking the following areas.

- P-4-P1 Freights doors. You should also be checking the Covington storages areas inside the P4-P3 freight area. On 4 occasions we have come across these doors not being locked and on two occasions the Facilities Master keys were left in the doors all night until the next morning.

- During your patrols in these areas you should be checking to make sure that all freight doors and storages doors are locked and secured.

- You should be checking that the inside of the doors are not blocked or taped to keep the door unlocked. We have several contractors working in the buildings and this is an easy way for them to go in and out of the storage rooms.
- Make sure that all card readers are working right.
- P2 floor you should be checking on the bike storage room door and the Covington Storage room door. Believe me by looking at the Fob active on the bike room door some of you have not check on it at all.
- 11N-10N Kitchen areas you should be checking the janitors closet to make sure the water is not running or a stove is left on or a fridge is in alarm.
- The rest of your patrol you should be checking on all doors on all floors. IDF rooms , Mother rooms and report if they are clean or not.
  We should always show a presence during business hours especial at night when staff are working late or a special event is going on.

  2:00 PM-0730  Shift:
  Chaunce, Donald, Harley ,Joe, Cox,

  Once a week please make sure you check the emergency phones on the P4-P3 Parking area and the Elevators.
  North -South building the Emergency stairwell phones including the 12N emergency phone and all elevator phones. Make sure you put you findings in the daily log and what Admiral officer you talked with during your phone checks.

  Should you have any questions or suggestion regarding this email please let me or Mike know.

  Please reply to this email saying you read it and understand what is expect of you .
  Thank you,
  -Derek

Derek New
Manager of Security & Safety

**Conversation with Derek New and Chauncey McBride on 12/22/2017 re Carlos Harley's complaint.**

I spoke with Derek on Friday morning, December 22. Derek emphatically denies that he ever made any comment to Carlos Harley asking if a contractor was his "brother". Derek was somewhat upset saying that he is tired of the 'race card' being played with him. He says he has been called in before on this and while his intentions were not to be insensitive, he has learned his lesson.

Derek says that Harley is very defensive and aggressive whenever he is spoken to about issues with his work. Derek says Harley doesn't take responsibility for anything and insists that he is shown proof when confronted about concerns with his work performance. When shown proof, e.g., footage of him bypassing a printer with paper on it, or in one instance where he was escorting cleaners and doors were left unlocked, he denies that the image is him.

Derek says that on the morning in question, December 14, Harley was being aggressive when he was speaking to him about not taking papers off of all of the printers. Derek asked me to speak with Chauncey McBride, another security officer who was at the desk at that time.

Derek says that Harley has been written up several times about his work performance.

Derek says that none of the other security officers like to work with him, naming James Cox, Chauncey McBride and Mario Navarro, because he is argumentative and doesn't take ownership of anything.

----------------------------------

I spoke with Chauncey McBride on Friday afternoon. Chauncey says that Derek was just pointing out to Harley that he had missed taking papers off of some of the printers during his rounds. Chauncey said that Harley took the criticism the wrong way and became highly defensive and combative. Chauncey went on to say that Derek was not being abusive. He said Harley was raising his voice and that Derek may have raised his voice slightly as well to speak over Harley. Chauncey felt that Derek was just doing what a supervisor does in pointing out issues or concerns. Chauncey said Derek told Harley he would have to write him up.

Chauncey went on to say that Harley is regularly defensive whenever given any feedback. He said that he trained Harley when he first came on board and he experienced this when he pointed out a mistake or a needed correction. Chauncey said that Harley is not accepting of constructive feedback. He gave two examples, one in which there was footage of him coming behind Harley and finding papers left in some printers. He says Harley' response was that the paper was put there after he'd patrolled the area (it was 4 a.m.). Another was an incident in which Harley was escorting cleaners and unlocking doors for them to vacuum offices. Two doors were left unlocked. Footage showed Harley unlocking them, but when continuing to look at footage after the cleaning crew had left, there was none of Harley re-locking the doors. Harley' response was that it didn't prove anything, that he could have come back later and it wasn't on camera. No explanation as to why the doors remained unlocked. At times, when shown footage of himself, especially in connection with things being missed on his rounds, he will claim it is not him.

Chauncey says he doesn't offer any feedback anymore.

**COVINGTON**

Investigator, EEOC
August 8, 2018
Page 2

Problems with Mr. Harley's performance quickly arose.  The Director of Security, Michael Lamb, counseled Mr. Harley in writing on his performance in August 2017 and again on November 29, 2017. (Exhibits A and B) The purpose of both written memoranda was to provide "a reminder," "to highlight two areas of concern," and "to give [Mr. Harley] the opportunity to improve [his] performance."  Covington's practice, and good management practice generally, is to ensure that employees understand where their performance is falling short of expectations so that they have an opportunity to correct and improve their performance.

The two performance areas highlighted in the memoranda were failing to ensure that certain doors with Covington's space were locked and spending excessive time socializing in the lobby or outside the building with the security guards employed by the building.

In the early morning of December 14, 2018, Mr. New brought to Mr. Harley's attention that he had failed to perform adequately another of his job duties (ensuring that no confidential papers were left on printers in common areas).  Later that day, after Mr. Harley called Covington's human resources office to express interest in making a complaint, he was contacted by Nisa Walls, Covington's Human Resources Director.  Mr. Harley complained to her that his manager was harassing him "for events beyond his control."  In essence, Mr. Harley disagreed with his managers' assessment of his performance.  He complained that his managers' concerns about his performance were mistaken, that they failed to show him proof of his errors and that they refused to look at his evidence that he was performing his duties.  He said that Mr. New "was trying to wear him down" by repeatedly telling him he was not doing his job.  And he complained that Mr. New said he was "disrespectful" when he disputed Mr. New's assessment of his performance.  He called Mr. New's treatment of him "unprofessional" and added that Mr. New (and a co-worker who was no longer with the firm) had made comments that were racial or otherwise insensitive.[1]

Ms. Walls investigated by talking to Mr. New, Mr. Lamb and several of Mr. Harley's co-workers.  (Exhibit C) The two managers stated that they had simply counseled Mr. Harley on his job performance issues and that he had been defensive and argumentative in response.  Significant corroborating evidence was provided by another security officer who had been present when Mr. New spoke with Mr. Harley on December 14.  This witness reported that the manager was "just pointing out to Harley" that he had missed some papers; that Harley "took the criticism the wrong way and became highly defensive and combative."  He noted that Mr. Harley was raising his voice during this discussion.

---

[1]     The comment attributed to the former co-worker was asking Mr. Harley if he had any crack. The racial comment attributed to Mr. New -- and denied by Mr. New -- was stating to Mr. Harley, when a black contractor came into the offices, there is "your brother."

**COVINGTON**

Investigator, EEOC
August 8, 2018
Page 3

The witness added that he had been responsible for Mr. Harley's training when he was hired. Even then, Mr. Harley was "not accepting constructive feedback" and was "regularly defensive." The witness recounted two examples where Mr. Harley refused to acknowledge his failure to perform his duties even when confronted by evidence on security videos. As a result, the witness said, he no longer offered feedback to Mr. Harley.

Ms. Walls concluded that there was no evidence of conduct that would constitute inappropriate harassment of Mr. Harley and no corroboration of Mr. New making racial jokes. She so advised Mr. Harley. She also counseled Mr. New, reminding him of his responsibility not to make insensitive or racial comments and not to engage in any retaliation against Mr. Harley for lodging his complaint.

Moreover, even if Mr. Harley's version of events were credited, they would not constitute unlawful racial harassment: his working environment was not "permeated" with intimidation, ridicule or racial comments that were so "severe or pervasive" as to be "abusive," *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993); the co-worker about whom Mr. Harley complained was no longer employed; and when Mr. Harley raised his concern, Covington took appropriate action, promptly investigating and counseling the other employee on the need to conduct himself in a professional manner.

<u>The Altercation</u>

Three months later, in March 2018, Covington learned of an altercation involving Mr. Harley and Mr. New in the parking garage. Covington immediately suspended both employees with pay while it conducted an investigation, which included interviews with each of them.

Covington's Chief Human Resources Officer, Annette Wigton, investigated the incident. She determined that Mr. New was driving into the parking garage when he saw Mr. Harley, rolled down his window and told Mr. Harley that he did not appreciate Mr. Harley saying that he is a racist. After Mr. New parked his car and got out, carrying a briefcase in one hand, Mr. Harley approached him and, according to Mr. New, chest-bumped him (Mr. Harley denied this). The two men scuffled; with his free hand, Mr. New put Mr. Harley in a headlock; they separated after further scuffling; Mr. New went towards the elevator and the two continued shouting at each other in an angry manner. A portion of this incident was recorded on a security tape, which Ms. Wigton later viewed. The video showed the headlock and the subsequent shouting, but not the initiation of the confrontation. The recording demonstrated both men actively engaging in the altercation, with neither man retreating or attempting to defuse the situation for several minutes.

Based on this investigation, Ms. Wigton recommended terminating both employees. (Exhibts D and E) Mr. New's conduct clearly fell far short of the expectations for a manager.

**COVINGTON**

Investigator, EEOC
August 8, 2018
Page 4

Mr. Harley's conduct was also unacceptable, for he escalated the incident by approaching the car and by engaging in an angry shouting match. Moreover, he may have initiated the physical altercation either by chest-bumping Mr. New or by approaching him in such a threatening manner as to cause Mr. New to defend himself with the headlock.

It does not matter which employee bore the greater responsibility for the incident. Even in a hockey game, where fighting is tolerated, *both* players are sent to the penalty box after a fight, not just the one who initiated the fighting. Covington is a law firm, not a hockey team, and it has much higher expectations: Covington expects all employees, including staff, to treat each other with courtesy and respect, and it communicates this expectation to all employees. (See Exhibit F)

If either Mr. New or Mr. Harley had acted with professionalism and restraint, this wholly-unacceptable incident would not have occurred. Mr. Harley was a participant and a contributor to this incident, and there can be no doubt that it was appropriate to terminate his employment, as well as Mr. New's employment, for their involvement in this incident.

<u>The Charge Has No Merit</u>

Mr. Harley speculates that Covington's real motivation for terminating his employment was to retaliate against him for the complaints of harassment he made three months earlier. This is simply speculation untethered to any facts. Covington's policies *encourage* employees to raise complaints of this nature. No basis exists for supposing that Covington bore any animus against Mr. Harley for doing so. And plainly, Covington had no special sensitivity about complaints directed against the two employees identified by Mr. Harley: one had left Covington prior to his making the complaint; the other, Mr. New, was terminated by Covington at the same time as Mr. Harley.

Mr. Harley's charge of unlawful retaliation thus rests on the clearly unsupportable and far-fetched contention that his involvement in the March 16 altercation was not the real reason for his termination. But it was this incident that caused Covington to act. Any sort of physical scuffle or fight is extremely unusual and unacceptable in a law firm, and Covington reacted immediately, suspending both employees with pay and launching an investigation into the facts. The investigator concluded that both employees should be terminated and this recommendation was implemented without delay.

**COVINGTON**

Investigator, EEOC
August 8, 2018
Page 5

      The evidence thus supports only one conclusion: Covington's stated reason for terminating Mr. Harley's employment -- his involvement in a physical altercation with his manager -- was its real reason.  We request that the EEOC dismiss Mr. Harley's charge.

                             Sincerely yours,

                             Jeffrey G. Huvelle
                             *Attorney for Respondent*
                             *Covington & Burling*

Attachments

*MS. Gregor*

Subject: **FW: Evening Printing Issues**

From: CHarley@cov.com

To: carlosharley24@yahoo.com

Date: Friday, March 09, 2018 06:02:42 AM EST

This message contains blocked images.   Show images   or   Always show images

**From:** Gregor, Carla
**Sent:** Wednesday, January 10, 2018 9:00 AM
**To:** Security WA <securitywa@cov.com>
**Subject:** Evening Printing Issues

I am extremely upset that this continues to happen time and time again.  I come in in the mornings and the 3 paralegals who sit next to me come out with documents that were printed by attorneys that are stapled and left on their desks.  I have discussed this with Security at least 3 maybe 4 times.  I was told the protocol was when the evening security guards walk around and finds printed documents left on the printers they were to shred them. This is NOT happening.  Whoever the evening guard is is not doing this but what upsets me even more is that they see the names of attorneys on the doors but they continue to THINK this belongs to paralegals.  Why can't the evening guard do what is expected with what we are told.

**Carla Gregor**
Legal Secretary

Covington & Burling LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001-4956
T +1 202 662 5924 | cgregor@cov.com
www.cov.com

This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail from your system. Thank you for your cooperation.

Subject:  **FW: Printer issue**

From:  CHarley@cov.com

To:  carlosharley24@yahoo.com

Date:  Friday, March 09, 2018 05:53:48 AM EST


-----Original Message-----
From: Gregor, Carla
Sent: Thursday, January 11, 2018 8:23 AM
To: Harley, Carlos <CHarley@cov.com>
Cc: New, Derek <dnew@cov.com>
Subject: RE: Printer issue

Thank you for your email but those signs mean ... they pick up their MAIL at that printer location.



Carla Gregor
Legal Secretary

Covington & Burling LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001-4956
T +1 202 662 5924 | cgregor@cov.com
www.cov.com

This message is from a law firm and may contain information that is confidential or legally privileged. If you
are not the intended recipient, please immediately advise the sender by reply e-mail that this message has
been inadvertently transmitted to you and delete this e-mail from your system. Thank you for your
cooperation.
-----Original Message-----
From: Harley, Carlos
Sent: Thursday, January 11, 2018 2:32 AM
To: Gregor, Carla <cgregor@cov.com>
Cc: New, Derek <dnew@cov.com>
Subject: FW: Printer issue

Hello Mrs. Gregor
I am security officer Harley let me start by sincerely apologizing for any inconvenience that may have
occurred from the placing of printed mail on your paralegals desk. I placed it there because of the notification
left at the print area for any mail for the selected individuals Ms. Ballantyne and Mr. Maya is to be delivered to
1155 south. I have enclosed a photo copy of that request that's on the mail box. let me apologize again for
any problem that may have come from this!
Respectfully
Officer Harley


-----Original Message-----
From: carlos harley [mailto:crayz_troubling69@hotmail.com]
Sent: Thursday, January 11, 2018 2:16 AM
To: Harley, Carlos <CHarley@cov.com>
Subject: Printer issue



# COVINGTON & BURLING LLP

Privileged & Confidential                                    March 22, 2018

## Memorandum

To:     Lindsay Burke; Jeffrey Huvelle; John Waters

From:   Annette Wigton

cc:     Matthew Mitchell; Nisa Walls

Re:     **Recommendation for Termination - Harley, Carlos**

  On Friday, March 16, 2018, I was made aware of a physical altercation between Carlos Harley, security officer and Derek New, Security Manager, having taken place on the P3 level of the City Center parking garage at approximately 5:30 a.m.  Carlos Harley reports to Derek New.

  By way of background, Carlos Harley has been with the firm since May 2017, employed as a security officer.  Harley has been formally warned twice for sub-par performance by New, on August 25, 2017 and November 29, 2017, including for basic functions such as not locking offices following evening cleaning, not picking up papers from printers during evening patrols, too much time spent talking with Admiral guards and not attending to his duties.  He has been described by co-workers and others as defensive and argumentative when being provided with feedback about his performance and it is said that he does not recognize or accept that he may need to do things differently to perform his job to expectations.  His fellow security officers have observed that he does not take responsibility for his actions (or inactions).  A different firm manager (not New) has described Harley as a "hot head."

  Harley raised a concern about New on December 14, 2017 by contacting HR. He met with Nisa Walls on December 19 and complained that New was harassing him and that New had

**COVINGTON & BURLING** LLP
March 22, 2018
Page 2

made racially insensitive comments to him. Walls undertook an investigation in the following

two weeks. She did not find corroboration for any racially insensitive comments toward Harley,

but she counseled New to be sensitive about his remarks in the workplace. Walls found that the

"harassment" that Harley complained of was merely New trying to exercise appropriate

supervision over Harley and give him feedback on his performance, and that his feedback

toward Harley was justified based on shortcomings in Harley's performance of his duties. In

early January, Walls conveyed the results of her investigation to Harley, explained that New had

been counseled about professionalism in the workplace, and explained to Harley that he would

remain on written warning concerning his work performance because the concerns were

justified. Since January, no further issues have been raised by Harley and no discipline has been

issued to Harley.

After the altercation on March 16, I met with Carlos Harley later in the same afternoon to

learn more about what happened. He met with me after he had left the emergency room, having

been diagnosed with a neck sprain following a physical altercation with Derek New earlier that

day. I asked him to explain what had happened between New and him that morning. Harley

explained that he had been on P3 checking doing his last rounds before his shift ended when he

saw New approaching in his vehicle. New rolled down his window and yelled that he did not

appreciate what Harley was saying about him. New said that Harley was calling him a racist to

others, which Harley denied. Harley reported that New went on to say that Harley's days were

numbered and that he was "tired of his shit." New parked his car and Harley said he ~~followed~~ *Not follow*
*new to Elevator*
New to his parking space. New got out of his car and Harley told New that he never called him a

racist, to which New responded, "If we were outside, I'd whoop your ass." Harley described

how New came towards him, grabbed him and put him in a headlock, throwing a punch at him,

twisting his body and trying to pull him to the ground. Harley said he was able to prevent

**COVINGTON & BURLING** LLP

March 22, 2018
Page 3

himself from being pulled to the ground by grabbing on to New's leg.  He was subsequently able to pull himself free and walked away, saying to New that it was "over."  Harley maintained that he did not engage in the fight with New.  He claimed he defended himself only.  Harley encouraged me to view the video on which the incident would have been captured.  Following the altercation, Harley said he went outside the building to call the police and report the assault. A police report was filed but the police have declined to take any action, referring the matter back to the firm.

I viewed the video tape capturing the incident.  While it is not evident who instigated the altercation, it is clear that New and Harley both engaged in physical contact.  New is seen putting his arm around Harley's head apparently in an effort to subdue and pull him to the ground.  Subsequently, the two men stood chest to chest, exchanging words.  Neither appears injured or fearful of the other or as if he is in retreat. New is then seen withdrawing from Harley but continuing to gesticulate and argue before retreating to the elevator vestibule.  New walked away from the vestibule and toward Harley two more times before finally getting on the elevator; the two were obviously engaging in a heated exchange.  Throughout the altercation, New is holding a soft-sided briefcase in his left hand.

New contended that Harley approached him as he got out of his car and chest-bumped him, and that he then put Harley in a head lock to try to subdue him before Harley pulled away.

Harley was notified via email on Friday evening, that he was being placed on paid suspension of duties pending further investigation.

While it is not evident who instigated the altercation, it is clear that Harley and New each affirmatively engaged in physical conduct toward the other.  Harley is seen arguing and gesticulating as the two part company.  Harley admitted that he followed New to New's parking

*Never admitted following New to his car*

**COVINGTON & BURLING** LLP

March 22, 2018
Page 4

space and confronted him, even though it's not clear whether Harley or New first made physical contact with the other, and their physical conduct after the brief altercation continued to be heated and threatening toward the other.

Harley is entrusted as a security officer.  He has demonstrated poor judgment by engaging in a physical altercation and argument with his supervisor.  He did not apparently make an attempt to avoid the confrontation but instead played a role in provoking it by following New to his car to confront him.  He did not appear fearful, calling into question the veracity of his statement that New started the physical altercation, and he continued to engage in a heated verbal exchange following the altercation.  He has already been warned about other aspects of his performance; this conduct further exemplifies his inability to perform to the expectations required of his role.   Therefore, I recommend that Carlos Harley's employment be terminated with immediate effect.

January 9, 2018

Talking points for Carlos Harley Harassment Complaint

Concluded my investigation - spoke with Derek New, Mike Lamb, a few the DSS employees who sit in the area, that you mentioned in our conversation.

Based on feedback received, I found no evidence of abuse or of a pattern of behavior that would constitute harassment.

You stated that Derek was uncivil to you and berated you on the morning of 12/14/17. You mentioned that Derek often speaks loudly and those in area can hear him. Only one person mentioned ever hearing slightly raised voices, but could not tell from whom or the context of the conversation.

You mentioned that you felt you were being harassed by Derek for events beyond your control. You mentioned that you were being blamed for not picking up papers from the printers. I was able to determine that the tasks you were assigned, for example, removing papers from the printers during your patrols, were consistent with the job duties and were no different than those asked of others in the Security Officer position.

You expressed concern that Derek would not let you show proof, e.g., video, fob swipes, etc., that you had been in certain areas. Both Derek and Mike Lamb noted that when they have shown you video of yourself in certain areas where items have been missed or doors not locked, you have denied that the image in the video is you. → *She never seen image also*

You raised work performance issues were brought to your attention with which you disagreed. It is the supervisor's role to raise concerns about work performance. That said, we expect all parties involved will conduct themselves in a professional, courteous and receptive manner during these conversations. I am relaying this message to all. If you disagree with, the feedback you are receiving and have information to show otherwise, I will be happy to review.

Finally, I was not able to find any corroboration of Derek making racial jokes. I did speak with him about this and made him aware that even in jest the Firm considers such remarks as insensitive and that behavior would not be tolerated. *I said off color Jokes*

We will continue to monitor the situation for. If you have any questions or concerns, please don't hesitate to contact me.

Please be advised that the Firm does not tolerate retaliation against employees for raising complaints, so you should let us know if you feels he suffers retaliation "continue to monitor the situation."

(and Derek New should also be told that we don't tolerate retaliation and it better be business as usual from him toward Harley).

DC: 6610129-1

*Mo..s*
*help*

*my cops cops*

## Harley, Carlos

| | |
|---|---|
| **From:** | New, Derek |
| **Sent:** | Wednesday, December 13, 2017 12:22 PM |
| **To:** | Harley, Carlos |
| **Cc:** | Lamb, Michael |
| **Subject:** | Printers & Bridge doors Unlocked/ Unsecured doors. |
| | |
| **Importance:** | High |

Carlos,

Per our pass verbal and written discussions, I would like to bring to your attention that I am still finding papers on printers after your shifts. This is part of your duty and responsibility to check all printers during your shift. It is important that all printers get checked during your shift at different times. Some of these documents were left on the printers for two days or more and were printed off during the day shift but still remained on the printers for more than two days. This is the responsibility of All Security Offices to do during their patrols.

In the last 3 weeks I have come across printers with papers on them.
- **12/01/17- 12/02/17**
- **971N**
- **917N**
- **675N**
- **2N LSS**

**12/8/17- 12/9/17**
- **773N** — 0828 *IDF 0827 — captured IDF*
- **573N** — 0817 *0819.43 — Captured IDF*
- **653N** — 0821 *0823 — Captured*
- **1117S** — 0845.29 *0847.19 Captured*

**12/9/17** When I came in I asked you if you unlocked the bridges doors and you said no due to the weather and I said that's good. Mr. Cox's even added it to the daily log at 05:15 that you did not unlock the doors due to bad weather. at 06:17 hrs when I was doing my patrol in the North building I found that the bridges doors were unlocked and I locked them. I also informed Mr. Cox's of my findings.

**12/12/17- 12/13/17** *1216/12 20 Captured*
- **1117S** — *1216/12 20 Captured*
- **5N IDF area.** ~~1614.48~~ *2332. 49 Captured*

During my patrol this morning I came across **1P3.10** freight area the Covington storage was open. The **Shipping and receiving double doors were not lock.**

Carlos I am asking you to pay more attention to detail during your patrols.

Please respond to this email and should you have any questions please feel free to talk with me on this.
Thank you,
-Derek

*Mario's help*

Subject:  FW: 6N Printer - Saturday 12.2.17 at 0105 hrs

From:  CHarley@cov.com
To:  carlosharley24@yahoo.com
Date:  Wednesday, December 06, 2017 12:45:53 AM EST

*My Copy*

**From:** Navarro, Mario
**Sent:** Tuesday, December 05, 2017 5:04 AM
**To:** Harley, Carlos <CHarley@cov.com>
**Subject:** 6N Printer - Saturday 12.2.17 at 0105 hrs

6N Printer – Saturday 12.2.17 at 0105 hrs



**Mario Navarro**
  Security Officer

Covington & Burling LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001-4956
T +1 202 662 6257 | mnavarro@cov.com
www.cov.com

# COVINGTON

This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail from your system. Thank you for your cooperation.



9N Printer -- Saturday Morning, Officer Cox never checked the Printer in the IDF Closet area.





2N LSS Printer – Friday 12.1.17 at 2207 hrs.







**DEPARTMENT OF VETERANS AFFAIRS**
Medical Center
50 Irving Street NW
Washington DC  20422

Southern Prince George's County VA Clinic
5801 Allentown Rd., Suite 106
Suitland, MD 20748

CARLOS MARCELLUS HARLEY
6503 HILL MAR DR APT 303
FORESTVILLE, MARYLAND, 20747

Dear CARLOS MARCELLUS HARLEY,
I have reviewed the results of the testing you recently had done here at
the Veterans Affairs Medical Center.

The Achilles tendon is intact. The plantar fascia is intact.

1.6 x 0.5 cm ganglion cyst emanated dorsally and laterally from
the sinus tarsi.

Subchondral cystic change at the medial talar dome with chondral
defects and cortical irregularity consistent with osteochondritis
desiccans. Secondary tibiotalar osteoarthritis is noted.

Mild degenerative change at the intermediate cuneiform-second
metatarsal joint and navicular-intermediate cuneiform joint.

The anterior, posterior, and peroneal tendons are intact.

The anterior and posterior tibiofibular ligaments are intact.

Mild irregularity of the anterior talofibular ligament is likely
secondary to a healed partial tear.

The calcaneofibular ligament is intact.

The deltoid and spring ligaments are intact.

Impression:

Subchondral cystic change at the medial talar dome with chondral
defects and cortical irregularity consistent with osteochondritis
desiccans. Secondary tibiotalar osteoarthritis is noted.

Mild degenerative change at the intermediate cuneiform-second
metatarsal joint and navicular-intermediate cuneiform joint.

Mild irregularity of the anterior talofibular ligament is likely
secondary to a healed partial tear.

1.6 x 0.5 cm ganglion cyst emanated dorsally and laterally from
the sinus tarsi.

Primary Diagnostic Code: MINOR ABNORMALITY

Please schedule a telephone appointment so we can discuss the results.

Please let me know if you have questions or concerns. You may call the Advice Line at 202-745-8247 to leave me a message or to schedule into my telephone clinic. Alternatively, you may send me a secure message, if you are an authenticated user of MyHealtheVet (www.myhealth.va.gov).

Sincerely,
Naveena Sompalli, MD



**DEPARTMENT OF VETERANS AFFAIRS**
Medical Center
50 Irving Street NW
Washington DC  20422

Southern Prince George's County VA Clinic
5801 Allentown Rd., Suite 106
Suitland, MD 20748

CARLOS MARCELLUS HARLEY
6503 HILL MAR DR APT 303
FORESTVILLE, MARYLAND, 20747

Dear CARLOS MARCELLUS HARLEY,
I have reviewed the results of the testing you recently had done here at
the Veterans Affairs Medical Center.

X-ray examination of the right and left ankle joints dated
5/4/2018.

Clinical history and reason for study: Bilateral neck pain after
trauma.

Comparison study: November 19, 2015.

No acute fracture is seen. Normal alignment of the ankle joints
are seen.

Right ankle: Small bony fragment adjacent to the medial malleolus
possibly related to old trauma. Small calcaneal enthesophyte.

Left ankle: Tiny lucency of the medial superior aspect of the
left talus possibly small subchondral cyst suggesting early
degenerative changes. A small calcaneal enthesophyte.

Impression:
No acute fracture is seen.  Degenerative changes are minimal.
Calcaneal enthesophytes are seen bilaterally that are small.

X-ray examination of the cervical spine dated 5/4/2018.

Clinical history and reason for study: Neck pain. After assault
one month ago.

Straightening of the neck and lack of cervical lordosis is seen
either due to muscle spasm or positioning. Tiny cyst there are of
C5 and to a lesser degree C4 and C3 are seen. The intervertebral
disc spaces are unremarkable. Left foraminal narrowing is seen at
the level of C4-C5.

Impression:

Early mild degenerative changes. No fracture is seen.

X-ray examination of the right shoulder dated 5/4/2018.

Clinical history and reason for study: Right shoulder pain after assault One month ago.

Comparison study: None.

No acute fracture is seen. Mild degenerative changes of the right acromioclavicular joint. The right glenohumeral joint is unremarkable.

Impression:
No fracture is seen.  Mild degenerative changes of the right acromioclavicular joint.

Please let me know if you have questions or concerns. You may call the Advice Line at 202-745-8247 to leave me a message or to schedule into my telephone clinic. Alternatively, you may send me a secure message, if you are an authenticated user of MyHealtheVet (www.myhealth.va.gov).

Sincerely,

Naveena Sompalli, MD

MEDICAL RECORD                                              Progress Notes
---

NOTE DATED: 03/16/2018 14:06
LOCAL TITLE: EMERGENCY DEPARTMENT PATIENT INSTRUCTIONS
STANDARD TITLE: EMERGENCY DEPT NOTE
VISIT: 03/16/2018 13:05 EMERGENCY DEPARTMENT-DAY-X
NAME:HARLEY,CARLOS MARCELLUS
AGE: 51    SEX: MALE   RACE: BLACK OR AFRICAN AMERICAN


Please follow up with your primary care clinic using one of the following
methods:
muscle strain
buprofen prn, warm compresses,
gentle stretching, ben gay:

**Make a telephone appointment:  These appointments are scheduled times
when we can talk about your concerns.  You can call the Patient Service Center
(202-745-8577) to schedule this appointment.

**Send a Secure Message, which is a secure email. To sign up for Secure
Messaging, please stop by the MyHealtheVet station in the atrium and ask to sign
up.


If you have received medications in the Emergency Department or a prescription
for medications that cause drowsiness/sleepiness, such as muscle relaxers or
certain pain medication, please do not operate machinery, drink alcohol or work
within eight hours of taking. X rays may have been performed
during this study, follow up with your primary care provider for the
final interpretation of such studies.  Return to the Emergency Department
if your condition changes or worsens prior to being seen by your primary
care provider.


MEDICATION RECONCILIATION:

  The process of medication reconciliation was completed during today's
visit. The veteran's current medications (including non-VA medications
and any changes made today) were reviewed with the patient and/or
caregiver. A written list was provided.

  MEDICATIONS UPON DISCHARGE (including non-VA meds):

Freestyle Lite (Glucose) Test Strip Use 1 Strip As Directed Twice Weekly Per Va
National Guidelines
Glipizide 5mg Tab Take One Tablet by Mouth Every Day
Hydrochlorothiazide 25mg Tabs Take One Tablet by Mouth Every Day
Sildenafil Citrate 100mg Tab Take One-half Tablet by Mouth 30 Minutes Before
Activity No More Than 4 Doses Monthly. Lost or Stolen Prescriptions Will Not Be
Replaced.


  NON-VA MEDS - NONE FOUND


DISCONTINUED MEDICATIONS:


ADDITIONAL MEDICATION INSTRUCTIONS:


PATIENT INFORMATION SOURCES IF QUESTIONS ARISE:
1) For appointment scheduling or cancellation, call 202-745-8577.
2) For Medical Advice or to obtain test results, call 202-745-8247.
3) For Pharmacy Questions, call 202-745-4046 or 1-888-553-0242.
4) If you need to talk or are in crisis, please call our Veterans
   Crisis Line at 1-800-273-8255 and press #1.

            ** THIS NOTE CONTINUED ON NEXT PAGE **
---
HARLEY,CARLOS MARCELLUS   WASHINGTON VA MEDICAL CENTER  Printed:03/16/2018 14:08
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 DOB:03/06/1967    Pt Loc: OUTPATIENT
                                                      Vice SF 509
---

MEDICAL RECORD                                    Progress Notes

03/16/2018 14:06     ** CONTINUED FROM PREVIOUS PAGE **

    If you are experiencing an emergency:  Call 911.


I have received and understand my medication(s).


PATIENT SIGNATURE: (to be scanned) -

Date/Time: Mar 16,2018@14:06


                    Signed by: /es/ AMY SUZANNE KRAVITZ
                               ATTENDING PHYSICIAN (Int-FB)
                               03/16/2018 14:07

DATE - 1/13/2018



Extra Copies







1/12/18

4N Cameras were not
working at this time.